UNITED STATES of America,
Appellee,

v.

Yamil H. KOURI–PEREZ, a/k/a Sealed
Defendant 1, Defendant, Appellant.

United States of America, Appellee,

v.

Yamil H. Kouri–Perez, et al.,
Defendants, Appellants,

Joaquin Monserrate–Matienzo,
Appellant.

Nos. 98–1612, 98–1663.

United States Court of Appeals,
First Circuit.

Heard March 2, 1999.

Decided May 7, 1999.

**4**

Martin G. Weinberg, with whom Osteri, Weinberg & Lawson, Kimberly Homan and Sheketoff & Homan were on brief for appellants Cerezo, et al.

Gerardo Ortiz–Del Rivero and David W. Roman, with whom Monserrate Law Office was on brief for appellant Monserrate–Matienzo.

Jorge E. Vega–Pacheco, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, María Domínguez–Victoriano, Assistant United States Attorney, Camille Vélez–Rivé, Assistant United States Attorney, and Nelson Pérez–Sosa, Assistant United States Attorney, were on brief for appellee.

Before SELYA, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.

CYR, Senior Circuit Judge.

Defense counsel appeal the sanction imposed upon them below for filing a vexatious discovery request. We dismiss for lack of appellate jurisdiction.

## I

### BACKGROUND

Appellants' clients were indicted in 1997 for theft of federal property and money laundering. Dealings between the prosecution and defense teams were acrimonious from the start. For present purposes, we focus upon the skirmish which began when Assistant United States Attorney ("AUSA") Maria Dominguez informed the court that she had reason to believe that one defendant had paid the retainer for codefendants' counsel. The defense then charged that AUSA Dominiguez had violated the Sixth Amendment by deliberately infiltrating the defense camp.

Although the district court ultimately found no evidence for the infiltration theory advanced by the defense, it entered a civility order "remind[ing] [counsel] that civility in litigation is a value that this court will protect and enforce[,]" and directed both sides thenceforth to refrain from "[d]isparaging personal remarks or acrimonious conduct."

Round two began in March 1998, when AUSA Dominguez submitted a *Brady* report which disclosed that during March 1997 the prosecution had interviewed a Dr. Joaquin Perez–Mendez in the Dominican Republic and that Dr. Perez possessed information favorable to the defense but refused to be deposed in Puerto Rico. Appellants then sought to depose Perez in the Dominican Republic. Absent opposition by the government, the district court directed that the deposition be taken at the United States Embassy.

Appellants submitted a second motion one month later, for permission to depose Dr. Perez at his own office, rather than the United States Embassy. The motion represented that AUSA Dominguez had telephoned Dr. Perez's spouse, and told her that her husband would go to prison unless he cooperated with the government. Further, appellants reported that Dr. Perez was fearful of confronting AUSA Dominiguez at the United States Embassy, because her "true [sur]name" was Leon–Trujillo, and she was the granddaughter of the former Dominican Republic dictator, Rafael Trujillo, by whom Dr. Perez's father had been confined as a political prisoner. The allegations in appellants' second motion were broadcast by the media.

AUSA Dominguez promptly denied any improper threats against Dr. Perez or his spouse and moved for sanctions against appellants. She objected to any implication that she used the surname Dominguez to conceal her ancestry, noting that she had been legally adopted in Florida as an infant. She questioned appellants' failure to contact her before filing their second motion to change the location of the deposition, particularly since the government never objected to appellants' unilateral choice of location. Finally, she contended that the only conceivable purpose served by the second motion was to harass or

humiliate her, in direct violation of the civility order.

The district court issued a show-cause order, which appellants claimed violated due process because it failed to provide adequate notice of the precise bases upon which the court was considering the imposition of sanctions. Appellants suggested in addition that their duty to represent their clients required that the basis for Dr. Perez's subjective fears be reported, in order that the merits of their motion might be cogently assessed by the district court, even if those fears appeared irrational or baseless.

In due course the district court accepted AUSA Dominguez's characterization of appellants' motives, and imposed a $4,000 sanction against appellants for violating its civility order and to deter any future noncompliance. The court expressly stated that it was not imposing the sanction pursuant to its criminal or civil contempt powers, but under 28 U.S.C. § 1927 or its inherent powers, with the warning that any future violation "may result in criminal contempt under [Federal Rule of Criminal Procedure] 42." The court directed appellants to pay the $4,000 sanction within ten days, under penalty of civil contempt. Appellants complied, then initiated their interlocutory appeals. In the meantime, the case proceeded to trial.

## II

### DISCUSSION

■ First, we must determine our jurisdiction. *See Petralia v. AT & T Global Info. Solutions Co.*, 114 F.3d 352, 353–54 (1st Cir.1997); *In re Licht & Semenoff*, 796 F.2d 564, 569–70 (1st Cir.1986) (noting the "regrettable" fact that many interlocutory appeals from attorney-sanction orders have been entertained without considering appellate jurisdiction). Normally, appellate jurisdiction depends upon the existence of a "final judgment," *see* 28 U.S.C. § 1291, that conclusively "disposes of all the rights of all the parties to an action,"

*Licht*, 796 F.2d at 569, "leav[ing] nothing for the [trial] court to do but execute the judgment," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 709, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (citation omitted). Thus, the "final judgment" rule minimizes dilatory, piecemeal litigation, and promotes judicial efficiency. *See Licht*, 796 F.2d at 569 (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981)).

■ Where its salutary effects are outweighed by other practical considerations, however, limited exceptions to the final judgment rule are recognized. For example, the *Cohen* (or "collateral order") exception enables an interlocutory appeal from an otherwise non-"final" order which meets four conditions. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The order *must* (1) concern a collateral issue so conceptually distinct from other issues being litigated in the underlying action that an immediate appeal would neither disrupt the main action, nor threaten to deprive the appellate court of useful context which might be derived from subsequent developments in the litigation; (2) completely and conclusively resolve the collateral issue; (3) infringe rights which appellant could not effectively vindicate in an appeal after final judgment in the case; *and* (4) involve an important or unsettled legal issue, rather than merely challenge discretionary trial court rulings. *See Licht*, 796 F.2d at 570–71 (citing *Cohen*); *United States v. Kane*, 955 F.2d 110, 111 (1st Cir.1992) (reformulating these same *Cohen* criteria into a three-part test).

On the question whether monetary sanctions against attorneys are "final," either under section 1291 or *Cohen*, the courts of appeals remain divided. *See Chaves v. M/V Medina Star*, 47 F.3d 153, 155 n. 7 (5th Cir.1995) (outlining circuit split); *compare, e.g., Frazier v. Cast*, 771 F.2d 259, 261–62 (7th Cir.1985) (permitting interlocutory appeal); *Cheng v. GAF Corp.*, 713 F.2d 886, 888–90 (2d Cir.1983) (same),

*with Click v. Abilene Nat'l Bank,* 822 F.2d 544, 545 (5th Cir.1987) (dismissing interlocutory appeal); *Eastern Maico Distribs., Inc. v. Maico–Fahrzeugfabrik,* 658 F.2d 944, 950–51 (3d Cir.1981) (same).[1]

■ In siding with the latter authorities some time ago we held that a discovery sanction against a law firm pursuant to Federal Rule of Civil Procedure 26(g) meets neither the section 1291 nor the *Cohen* finality requirements. *See Licht,* 796 F.2d at 569–73 (dismissing law firm's interlocutory appeal). Rule 26(g) forbids the interposition of a discovery request by counsel "for any improper purpose, such as to harass," Fed.R.Civ.P. 26(g); *see Licht,* 796 F.2d at 567 (noting that district court expressly found that attorneys' "primary purpose in deposing [witnesses] was to harass"), and empowers the court to impose an "appropriate sanction" for its violation. Since we are bound by First Circuit precedent closely on point, *see Institut Pasteur v. Cambridge Biotech Corp.,* 104 F.3d 489, 493 n. 8 (1st Cir.1997), appellants face an uphill battle given the clear parallels between *Licht* and the present case.

■ Notwithstanding the statements to the contrary by the district court, appellants insist that the challenged sanction issued pursuant to its statutory power to punish counsel for criminal contempt. *See* 18 U.S.C. § 401; *In re Power Recovery Sys., Inc. (Eck v. Dodge Chem. Co.),* 950 F.2d 798, 802 (1st Cir.1991) (in distinguishing between criminal and civil contempt, appellate court must go beyond mere labels, and assess substantive attributes and aims of sanction). Were we to adopt their approach, appellants would achieve two distinct advantages. First, by mischaracterizing the district court sanction as a criminal-contempt order, from which an interlocutory appeal would lie, appellants circumvent the customary barrier to interlocutory appeals from civil-contempt orders. *See Licht,* 796 F.2d at 568. Second, in so doing appellants would prevail on the merits since the district court did not purport to conform its order with the heightened procedural requirements attending criminal-contempt adjudications. *See* Fed. R.Crim.P. 42; *see also, e.g., Hicks v. Feiock,* 485 U.S. 624, 632–33, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (criminal contempt must be proven "beyond a reasonable doubt"); *Power Recovery,* 950 F.2d at 802 n. 18.

■ Appellants argue that the sanction order essentially bears the attributes of a criminal contempt, rather than a civil contempt.[2] By apportioning the entire

---

1. Appellants rely on several decisions permitting interlocutory appeals where sanctioned counsel were no longer actively involved in the main proceeding at the time of the appeal. *See, e.g., Martin v. Brown,* 63 F.3d 1252, 1262 (3d Cir.1995); *see also Licht,* 796 F.2d at 568 (observing that some courts had considered attorney's nonparticipation determinative of jurisdiction). *But see Starcher v. Correctional Med. Sys., Inc.,* 144 F.3d 418, 424–25 (6th Cir.1998) (finding nonparticipation immaterial, and dismissing attorney's interlocutory appeal), *cert. granted sub nom. Cunningham v. Hamilton County, Ohio,* — U.S. —, 119 S.Ct. 864, 142 L.Ed.2d 716 (1999). As appellants still represent their clients in the underlying criminal case, these cited cases are inapposite. *See Licht,* 796 F.2d at 569 ("[A]n attorney actively representing a party is not like a nonparty. . . .").

2. Generally, fines imposed pursuant to a civil-contempt order are remedial, designed primarily to coerce an offending party into prompt compliance with a judicial mandate. Once the contemnor comes into compliance, the contempt is purged and no further fines are incurred. *See United States v. Marquardo,* 149 F.3d 36, 39 (1st Cir.1998). By contrast, a monetary fine imposed in connection with a criminal contempt adjudication is essentially punitive and deterrent in purpose, rather than remedial. That is, it vindicates judicial authority by assessing a one-time penalty for past disobedience of a court order. *See id.* at 39–40. Since criminal contempt proceedings address a completed crime, and the fine imposed is a criminal "sentence," *see In re Kave,* 760 F.2d 343, 351 (1st Cir.1985), the contemnor lacks the unilateral option to avoid the fine by future compliance with the court order. Further, since the fine is punitive rather than compensatory, its amount need not be exclusively commensurate with victim loss. *See Marquardo,* 149 F.3d at 40.

universe of district court sanctions into but two categories, however, appellants impermissibly presume that any sanction that does not proceed from the district court's civil-contempt power necessarily proceeds from its criminal-contempt power. As *Licht* itself establishes, the dichotomy proposed by appellants is demonstrably mistaken. Instead, the pertinent distinction in the present context is between punitive *contempt* sanctions and punitive *non-contempt* sanctions.

 The challenged sanction is expressly predicated on the "inherent powers" of the federal district courts.[3] Article III courts were imbued with an array of "inherent powers" in performing their case-management function from the moment of their establishment, powers never specifically enumerated in the Constitution or in legislative enactments, yet "necessary to the exercise of all other[ ] [enumerated judicial powers]." *United States v. Horn*, 29 F.3d 754, 759 (1st Cir.1994) (citing *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). These implicit powers include the judicial authority to sanction counsel for litigation abuses which threaten to impugn the district court's integrity or disrupt its efficient management of the proceedings. *See Chambers*, 501 U.S. at 43, 111 S.Ct. 2123 (noting that inherent district court powers include authority to "control admission to its bar and to discipline attorneys who appear before it"); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) ("The power of a court over members of its bar is at least as great as its authority over litigants."). Moreover, its criminal

contempt power over counsel inheres in the district court's inherent or its so-called supervisory power. *See In re Terry*, 128 U.S. 289, 302–03, 9 S.Ct. 77, 32 L.Ed. 405 (1888); *Horn*, 29 F.3d at 765 n. 13 ("[C]ontempt originated as an aspect of the supervisory power."). In time, some of these inherent powers were made explicit, either by enactment or the promulgation of procedural, disciplinary or ethical rules.

 Thus, Congress enacted 18 U.S.C. § 401, which codified the district court's implicit power to hold litigants in criminal contempt. *See also* 28 U.S.C. § 1927 (authorizing imposition of "excess costs" upon counsel who "unreasonably and vexatiously" multiply proceedings). Further, the Federal Rules of Civil Procedure include provisions empowering district courts to punish counsel for various pleading and discovery abuses. *See, e.g.*, Fed.R.Civ.P. 11 (imposing sanction on counsel who signs pleading or motion intended "for any improper purpose, such as to harass"); *Chambers*, 501 U.S. at 42 n. 8, 111 S.Ct. 2123 (listing procedural rules prescribing attorney sanctions). In each instance, the sanctions are *punitive* in nature, *see Horn*, 29 F.3d at 765 n. 13 ("[C]ontempt ... continues to serve essentially 'the same purpose' as do sanctions imposed under the supervisory power.") (citation omitted), in that the court intends to penalize counsel for an earlier failure to conform to some threshold of professional conduct imposed by court order, statute or rule. *See, e.g., Peterson v. BMI Refractories*, 124 F.3d 1386, 1395 (11th Cir.1997) (noting that 28 U.S.C. § 1927 is "penal in nature"); *Cooper v. Salomon Bros.*, 1 F.3d 82, 85 (2d Cir.1993) ("Rule 11 sanctions are often punitive or aimed at deterrence."); *Hamilton v. Ford Motor Co.*, 636 F.2d 745, 747

---

**3.** The district court cited 28 U.S.C. § 1927 as an independent source of authority for its sanction. Since we conclude that the sanction was within its inherent powers, *see infra*, we need not address section 1927. *But see Roadway Express, Inc. v. Piper*, 447 U.S. 752,

758, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (narrowly construing § 1927); *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir.1997) ("[Section] 1927 is not a 'catch-all' provision for sanctioning objectionable conduct by counsel.").

(D.C.Cir.1980) ("The principal purpose of Rule 37(b) is punitive, not compensatory.").

▋ The federal district courts nonetheless retain their *inherent* power to impose sanctions unless its exercise directly conflicts with subsequently promulgated rules or enactments. *See Chambers,* 501 U.S. at 46, 50, 111 S.Ct. 2123 ("[T]he court ordinarily should rely on the Rules rather than the inherent power . . . [b]ut if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power[s]," which "must continue to exist to fill in the interstices."); *Mark Indus. v. Sea Captain's Choice, Inc.,* 50 F.3d 730, 733 (9th Cir.1995); *cf. John's Insulation, Inc. v. L. Addison and Assocs., Inc.,* 156 F.3d 101, 108 (1st Cir.1998) (courts invoking inherent powers may be guided by analogy to the Rules). Thus, to say that the sanctions imposed below are punitive in nature is not to suggest that they are tantamount to *de facto* criminal contempt adjudications.

In considering appropriate sanctions for attorney misconduct, the district court has an array of options, ranging from criminal contempt to non-contempt measures. *See Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 564 (3d Cir.1985) (en banc) (noting that district judges have "a wide range of tools to promote efficiency in their courtrooms"). Frequently, there will be sound grounds for not invoking the court's criminal-contempt power, especially since its potency necessitates that it be used "with restraint and discretion." *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123; *see Whitney Bros. Co. v. Sprafkin,* 60 F.3d 8, 13 (1st Cir.1995). Therefore, normally there is much to be said for deploying the least extreme sanction reasonably calculated to achieve the appropriate punitive and deterrent purposes. *See In re Oliver,* 333 U.S. 257, 274, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (contempt powers require the "least possible power adequate to the end proposed") (citation omitted); *Horn,* 29 F.3d at 760 ("[I]t is inappropriate for courts to attempt

to use [inherent powers] to justify an extreme remedy when, short of such heroic measures, the means are at hand to construct a satisfactory anodyne more narrowly tailored to the objective."); *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3rd Cir.1994).

▋ Thus, the criminal contempt power is to be reserved for conduct that bespeaks a criminal *mens rea* (*i.e.,* intentional or reckless conduct) and has been proven beyond a reasonable doubt, whereas non-contempt sanctions normally suffice in circumstances involving less culpable states of mind. *See Chambers,* 501 U.S. at 47, 111 S.Ct. 2123 (noting that Rule 11 sanctions may be imposed even where attorney conduct falls short of "reasonableness" standard); *Cruz v. Savage,* 896 F.2d 626, 631–32 (1st Cir.1990) (same); *see also United States v. Claros,* 17 F.3d 1041, 1047 n. 4 (7th Cir.1994) (Rule 11 . . . impos[es] a "negligence standard," and Rule 37 violations are sanctionable even where attorney did not act in "bad faith"); *Harlan v. Lewis,* 982 F.2d 1255, 1260 (8th Cir.1993) (noting, in dicta, that "inherent powers" sanction may be imposed for ethical-rule violations absent "bad faith" on part of counsel).

▋ Although the "label" employed by the district court is not necessarily determinative in distinguishing criminal and civil contempt, *see Power Recovery,* 950 F.2d at 802, often it is significant indeed in distinguishing criminal contempt adjudications from non-contempt punitive sanctions. A formal judicial finding of "contempt" connotes the highest level of censure against counsel. *See In re Kave,* 760 F.2d 343, 349 (1st Cir.1985) (reviewing for contempt where master expressly held that counsel was "contemptuous of [the] Court."); *Buffington v. Baltimore County, Md.,* 913 F.2d 113, 132–35 (4th Cir.1990) (en banc) (vacating punitive fine, where district court expressly held counsel in "contempt" for discovery abuses, but affirming "civil" sanction imposed pursuant

to inherent powers); *cf. In re Williams,* 156 F.3d 86, 89–90 (1st Cir.1998) (noting that bankruptcy court "findings" criticizing counsel's performance were not equivalent to a sanction or officially designated reprimand), *cert. denied,* — U.S. —, 119 S.Ct. 905, 142 L.Ed.2d 904 (1999).

■ Thus, we reject the contention that the sanction imposed against appellants necessarily amounted to an adjudication of criminal contempt simply because it was not a civil contempt sanction. *See Chambers,* 501 U.S. at 46, 111 S.Ct. 2123 ("The imposition of [inherent-power] sanctions ... vindicat[es] judicial authority *without resort to the more drastic sanctions available for contempt.*") (emphasis added; citation omitted); *In re Sutter,* 543 F.2d 1030, 1037–38 (2d Cir.1976) (same); *see generally* Comment, *Financial Penalties Imposed Directly Against Attorneys in Litigation Without Resort to the Contempt Power,* 26 UCLA L.Rev. 855 (1979) (collecting cases). Quite the contrary, the district court explicitly disclaimed any intention to hold appellants in contempt, instead imposing a non-contempt, "inherent powers" sanction for their harassment of opposing counsel, akin to the sanction in *Licht.* Consequently, appellants must distinguish their non-contempt sanction from that imposed in *Licht. See Institut Pasteur,* 104 F.3d at 493 n. 8.

■ First, appellants suggest that *Licht* should govern only if the underlying proceeding is civil, as distinguished from criminal. We do not agree. Federal district courts not only exercise their inherent power to impose sanctions in both civil and criminal cases, *see Claros,* 17 F.3d at 1042, but their contempt powers "developed most robustly in the area of criminal procedure," *see Horn,* 29 F.3d at 759, where the codified rules leave more interstices. And, of course, interlocutory appeals in criminal cases are the exception. *See, e.g., Kane,* 955 F.2d at 111 (noting Supreme Court authority restricting *Cohen* appeals in criminal cases to three narrow categories: refusals to dismiss indictments for

violations of double jeopardy clause or speech and debate clause or to reduce bail); *D & H Marketers, Inc. v. Freedom Oil & Gas, Inc.,* 744 F.2d 1443, 1445 (10th Cir.1984). Were it otherwise, trial counsel would be diverted from their primary responsibility—their clients' upcoming trials—while pursuing their own interlocutory appeals. Such distractions are even less appropriate in criminal cases than in civil actions. *See Kane,* 955 F.2d at 110 ("As a result of the 'compelling interest in prompt trials,' the requirements of the collateral order doctrine have been interpreted 'with the utmost strictness' in criminal prosecutions.") (citation omitted).

Next, appellants observe that the *Licht* sanction issue was not entirely separable from other matters to be litigated in the main action. Thus, should the evidence sought during discovery in *Licht* have proven irrelevant to any issue litigated at trial, counsel's discovery-related conduct would not have supported the monetary sanctions imposed. *Cf. Licht,* 796 F.2d at 572 (noting that delayed appeal would allow appellate court to view case as a whole). In contrast, appellants argue, no valuable insights can be gained by postponing the present appeal until final judgment, since the propriety of their conduct *vel non* cannot be elucidated by developments at trial.

We do not share their confidence that no relevant insights lie in store. In resisting these sanctions below, appellants maintained that their reports of the factual grounds for Dr. Perez's subjective fears about AUSA Dominguez were made in good faith, even assuming that Dr. Perez's anxieties were irrational or ill-founded. Nevertheless, the district court noted countervailing evidence—such as appellants' failure to request AUSA Dominguez's prior consent to relocate the deposition, and their failure to submit an affidavit from Dr. Perez at the "show cause" hearing—which could support an inference that appellants' excuse was presented in bad faith and for the sole pur-

pose of harassing and humiliating AUSA Dominguez. *Cf. id.* at 570 ("The district court's sanction order was directed at the [law] firm's conduct of discovery and *purpose for undertaking it.*") (emphasis added). Thus, we cannot say that it is beyond the realm of possibility that a full trial record may afford important insights into appellants' actual motives, and, at the very least, permit a better informed appellate assessment as to whether appellants continued to engage in a discernible *pattern* of harassment.

Appellants next contend that the district court announced its intention *never* to reconsider its sanction, thus satisfying the second—"conclusiveness"—criterion under *Cohen.* Although the district court did decline immediate reconsideration of its sanction, there is no barrier to a future reconsideration. Moreover, in *Licht* we simply observed that "the sanction may never be *finally imposed.*" *Id.* (emphasis added). We did not base our decision on the announced intention by the district court to keep an open mind, but rather on the well-settled principle that the district court retains the inherent power to modify or rescind monetary sanctions at any time, as circumstances warrant. *Id.* at 570 ("We are not suggesting that any of these *possibilities* should or *will be followed* in this case, but their *existence* detracts from the finality of the order.") (emphasis added).

Finally, the prospect for canceling the fine may be somewhat better where the monetary sanction imposed by the court remains in the court registry.

Appellants argue that the monetary sanction in *Licht* reflected the opposing party's corresponding losses, and therefore was compensatory, whereas the instant sanction was calculated solely for its punitive and deterrent effect. *See id.* at 567 (sanction made payable to opposing parties). As already noted, however, *see supra,* most non-contempt monetary sanctions—including the *Licht* sanction—are at least partially punitive in purpose, designed to penalize counsel for a discrete violation of a court order or rule. *See, e.g., Media Duplication Servs., Ltd. v. HDG Software, Inc.,* 928 F.2d 1228, 1242 (1st Cir.1991) ("[T]he focus of any sanction need not be limited to compensation of opposing counsel."); *Mark Indus.,* 50 F.3d at 733 (refusing to disturb sanction because "the amount of an inherent powers sanction is meant to do something very different than provide a substantive remedy to an aggrieved party . . . [but instead] . . . 'vindicat[e] judicial authority' ").[4] Thus, their punitive nature does not convert these sanctions into criminal-contempt fines, *see supra,* nor meaningfully affect the *Cohen* calculus, given that the payee's identity lends no increased urgency to appellants' interlocutory challenge.[5]

---

**4.** Likewise, as here, the district court may fix the amount of the monetary sanction through reference to its deterrent effect. *See John's Insulation,* 156 F.3d at 110 ("[T]he purpose of sanctions, moreover, is not merely to penalize violations of court procedures, but also to deter future violations by other parties, and thus sanctions do not have to be strictly proportional to the severity of a given party's violations."); *Jones v. Winnepesaukee Realty,* 990 F.2d 1, 6 (1st Cir.1993) ("Deterrence is a widely recognized basis for determining the amount of a monetary sanction" imposed under court's inherent powers.).

**5.** For the same reason, we reject appellants' attempt to distinguish *Licht* on the ground that the sanction was paid to the opposing party, rather than into the court registry. *See Jones,* 990 F.2d at 5 (noting that court "is

necessarily vested with considerable discretion . . . in determining what form the sanctions should take"). Where a monetary sanction is primarily punitive, the opposing party may not have suffered any loss, or may receive an unjustified windfall, or may itself have unclean hands. Thus, courts frequently have grounds for directing payment of non-contempt fines into the registry of the court. *See, e.g., Silva v. Witschen,* 19 F.3d 725, 729 n. 5 (1st Cir.1994) ("[U]nder amended Rule 11, 'if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty.' ") (citation omitted); *Jones,* 990 F.2d at 6 n. 10 ("inherent power" monetary sanction was paid into district court registry); *see also RTC v. Dabney,* 73 F.3d 262, 267 (10th Cir. 1995) ("inherent power" sanctions may be payable to court account to compensate for court's time); *Mark Indus.,* 50 F.3d at 733

Appellants complain also that their sanction was made immediately payable, unlike the sanction in *Licht*. *See Forgay v. Conrad*, 47 U.S. (6 How.) 201, 12 L.Ed. 404 (1848). This thrust fails as well. First, *Licht* did not indicate whether or not the Rule 26 sanction was immediately payable, nor suggest in any way that it would be material to appellate jurisdiction. Further, appellants vastly overstate the *Forgay* "practical finality" doctrine, which merely permits interlocutory appeals from "immediate payment" orders which threaten a special risk of harm to the appellant. *See, e.g., Schaffer v. Iron Cloud, Inc.*, 865 F.2d 690, 691–92 (5th Cir.1989) (dismissing interlocutory appeal of sanction order, even though court directed immediate payment); *Eastern Maico*, 658 F.2d at 948 (dismissing interlocutory appeal, and noting that normal risks attending immediate payment cannot satisfy *Cohen's* third prong since "the same risk is present to some degree in almost every order for sanctions where execution precedes review"). Thus, for example, appellants would need to establish financial inability to pay the fine, or that the party to whom the payment must be made is in so precarious a financial condition that it may be impossible to recover the payment should the sanction order be reversed on final appeal. *See Cleveland Hair Clinic, Inc. v. Puig*, 104 F.3d 123, 126 (7th Cir.1997); *Ortho Pharm. Corp. v. Sona Distribs.*, 847 F.2d 1512, 1516 (11th Cir.1988); *ODC Communications Corp. v. Wenruth Invs.*, 826 F.2d 509, 513–14 (7th Cir.1987); *In re Stable Mews Assocs. (Stable Mews Assocs. v. Togut )*, 778 F.2d 121, 124 (2d Cir.1985).

These appellants, all practicing attorneys, collectively remitted the $4,000 fine to the district court prior to their appeal, and do not suggest that their remittance has caused undue financial hardship. *See Robinson v. Tanner*, 798 F.2d 1378, 1381–82 (11th Cir.1986) (no appeal permitted where appellant did not allege that he was financially unable to make immediate payment of monetary sanction); *Ortho Pharm.*, 847 F.2d at 1515–16 (noting that size of sanction—$35,000—could be material to whether appellant would suffer significant liquidity problems). Furthermore, as the fine was paid into the court, *see supra* note 5, rather than to an opposing party, appellants need fear no dissipation of the monies pending final appeal.[6]

Appellants reserve their most fervent arguments for the third prong in the *Cohen* analysis, which requires them to demonstrate irreparable harm in the event their appeals were delayed until final judgment. Three distinct harms are identified: (1) the significant professional stigma attending the allegedly unjustified public reprimand delivered by the district court; (2) the untested civility order, if allowed to remain in place pending final judgment, would intimidate them into less vigorous advocacy, thus depriving their clients of their constitutional entitlement to the effective assistance of counsel; and (3) eventually they may be placed in a conflict of interest with their clients, who may not be interested in pursuing an appeal from a final judgment in the criminal case (*e.g.*, an acquittal).

The "irreparable harm" prong is the most crucial among the four *Cohen*

---

("inherent power" sanction properly made payable to court); *Riverhead Sav. Bank v. National Mortgage Equity Corp.*, 893 F.2d 1109, 1112 (9th Cir.1990) ("Sanctions under Rule 11 can be made payable either to the clerk of the court or to the opposing party").

**6.** Other authorities cited by appellants on this point are inapposite as well. In *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the Court permitted an interlocutory appeal from an order

requiring that the defendant in a class action immediately pay 90% of the costs of notifying class members. Its jurisdictional decision was based not on the immediacy of payment, but on the fact that the plaintiff could not afford the lawsuit at all unless the defendants funded class notification. Thus, for *Cohen* purposes, the propriety of the trial court's pretrial decision was entirely dispositive of the main action. *Id.* at 171–72, 94 S.Ct. 2140.

criteria, and frequently proves fatal to appellants. *See Licht*, 796 F.2d at 571. Clearly, "irreparable harm" contemplates much more than that an appellant possess reasons for preferring immediate appellate review, or deem it more convenient or exonerative. Rather, an appellant must demonstrate that "denial of an immediate appeal would make effective [appellate] review *'impossible,'* or would *'destroy'* the 'legal and practical value' of the appellant's right to appeal." *Id.* (emphasis added) (quoting *Firestone Tire*, 449 U.S. at 376–77, 101 S.Ct. 669); *see United States v. Ryan*, 402 U.S. 530, 533, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971). Normally, even the prospect that pretrial error might necessitate a retrial is insufficient to establish irreparable harm. *See D & H Marketers*, 744 F.2d at 1445 ("Mere error in the [sanction] order does not satisfy the requirement that the order be effectively unreviewable on [a final] appeal.") (citing *Firestone Tire*, 449 U.S. at 378, 101 S.Ct. 669). Given its demanding regimen, appellants cannot distinguish *Licht*.

■ A risk of professional stigma surely attends most sanction orders, since sanction either explicitly or implicitly impugns counsel's professional ethics or competence. After all, trial counsel are not sanctioned for exemplary conduct. Accordingly, the *Licht* sanction inarguably cast counsel in an unfavorable light, and although one might debate the relative harshness of a particular obloquy, jurisdictional determinations cannot be made to turn on such subjective vagaries.

In our view, moreover, appellants exaggerate the stigmatizing effect that a sanction has in the interim. Until a sanction order becomes "final" (*i.e.*, nonappealable), the public and the legal profession understand that the *trial court* considered counsels' conduct sanctionable, but surely make

allowance for the prospect that the sanction, if erroneous, may be reversed on appeal. *Cf. Martin v. Brown*, 63 F.3d 1252, 1261–62 (3d Cir.1995) (noting that professional stigma might satisfy irreparable-harm prong *where attorney was no longer participating* in litigation).[7]

■ Similarly, we believe the alleged chilling effect the sanction may have on appellants' advocacy during the interim is not material to the present analysis. Notwithstanding the risk of sanctions, defense counsel are obligated to represent their clients vigorously, within the bounds of all applicable ethical codes, particularly in a criminal case where the stakes may be much greater than in civil cases. *Cf. Licht*, 796 F.2d at 572 (noting that despite delay in appeal of sanction order, "[t]he firm's ethical obligation is to its client's best interests"); *Chambers*, 501 U.S. at 47 n. 11, 111 S.Ct. 2123 ("[T]here is little risk that courts will invoke their inherent power 'to chill the advocacy of litigants attempting to vindicate all other important federal rights.' ") (citation omitted).

■ Although it may be difficult on occasion to draw the line between zealous advocacy and unacceptable courtroom tactics, the line must be drawn, *cf. United States v. International Bhd. of Teamsters*, 948 F.2d 1338, 1343 (2d Cir.1991) ("Drawing a line between zealous advocacy and frivolous conduct, Rule 11 provides a vehicle for sanctioning an attorney."), and the district courts are better able to draw it in the first instance. Counsel must represent their clients' interest within that line, and not beyond it. *See Jones v. Winnepesaukee Realty*, 990 F.2d 1, 5 (1st Cir.1993) ("In this age of burgeoning litigation expense and overcrowded dockets, ... a busy trial judge should [not] have to toler-

---

7. Appellants vainly attempt to equate their sanction with a disciplinary action, which is usually subject to immediate appeal. *See Thornton v. General Motors Corp.*, 136 F.3d 450, 453 (5th Cir.1998). Disciplinary actions which disbar or suspend an attorney from law practice do fit the *Cohen* mold, of course, precisely because they strip attorneys of their livelihood, a deprivation which may not be completely vindicated on appeal from the final judgment. *See id.*

ate litigants' repeated efforts to stall a case [or] harass other participants."); *United States v. Cooper*, 872 F.2d 1, 3 (1st Cir.1989) ("[A]n attorney is not free to say literally anything and everything imaginable in a courtroom under the pretext of protecting his client's rights to a fair trial and fair representation."); *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir.1986) ("An attorney's ethical obligation of zealous advocacy ... does not amount to *carte blanche.*"); *D & H Marketers*, 744 F.2d at 1446 (noting that disallowing attorneys' interlocutory appeals has the salutary effect of "reinforcing the [attorneys'] necessary deference to the trial court's broad discretion in managing cases").

Upon appeal from a final judgment, of course, sanctioned counsel may argue with equal vigor that the sanction order improperly constrained effective advocacy, and if successful, an adequate remedy would lie. *See Cooper*, 872 F.2d at 5 ("Lawyers using professional care, circumspection and discretion in exercising that right need not be apprehensive of chastizement (sic) or penalties for having the advocative courage" to represent their clients vigorously.). But though the fact that trial counsel would have drawn the line differently than the trial judge may be grist for an appeal, it does not follow that it enables an *interlocutory* appeal. *See D & H Marketers*, 744 F.2d at 1445.[8]

■ Furthermore, as we stated in *Licht*, we see no reason to suppose that these appellants cannot effectively challenge the sanction order following final judgment—no matter the trial outcome—without risking a conflict of interest with their clients. *See Licht*, 796 F.2d at 572 ("[W]e have found nothing to convince us that the appeal could be lost in those circumstances.... We see no reason why an attorney should not be allowed to appeal a

sanction order when the main case is terminated without an appeal. The sanction order affects the attorney directly and independently."); *see also Sanders Assocs., Inc. v. Summagraphics Corp.*, 2 F.3d 394, 398 (Fed.Cir.1993) (an attorney can appeal after final judgment "even if there is no appeal by a party with respect to the merits"); *United States v. Wallace*, 964 F.2d 1214, 1217 (D.C.Cir.1992) ("After the rescheduled trial, at which defendant was *acquitted,* [sanctioned attorney] moved that the trial court reconsider its sanction," and then filed appeal) (emphasis added); *cf. Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199–200, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (noting that attorney-fee awards are separately appealable from underlying final judgment).

Most cases, civil as well as criminal, end in a final judgment of some sort. Thus, should appellants' clients be acquitted, or enter a plea, an independent appeal would lie from the sanction order. Similarly, should their clients be convicted, their appeals can proceed in tandem with appellants, thereby promoting judicial efficiency, an important goal of the "final judgment" rule.

■ Finally, focusing on *Cohen's* final prong, appellants argue that their appeal involves very important legal issues, such as the alleged violation of their right to procedural due process by the district court. While we have no doubt that these constitutional rights are weighty, the reality is that the district court cannot impose *any* enforceable sanction, even a *Licht*-type sanction, absent compliance with all applicable procedural due process requirements. *See Chambers*, 501 U.S. at 50, 111 S.Ct. 2123; *Roadway Express*, 447 U.S. at 767, 100 S.Ct. 2455; *Societe Internationale Pour Participations Industrielles et Com-*

---

8. Moreover, it would be perverse to countenance dilatory interlocutory appeals by counsel where the challenged sanction itself is predicated on their dilatory or obstructive tactics, such as harassment. *See Eastern Maico*, 658 F.2d at 949 ("If every sanction im-

posed to deter delay were immediately appealable, a litigant could forestall resolution of its case almost indefinitely."); *see also G.J.B Assocs., Inc. v. Singleton*, 913 F.2d 824, 829 (10th Cir.1990) (same).

*merciales v. Rogers*, 357 U.S. 197, 209, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *United States v. 789 Cases of Latex Surgeon Gloves*, 13 F.3d 12, 15 (1st Cir.1993) ("The '[l]ack of fair notice is fatal to [the court's] exercise of inherent power.'") (citation omitted). Moreover, appellants' argument would permit sanctioned counsel to evade section 1291 simply by alleging a due-process violation, thereby rendering *Licht* a dead letter. Just as importantly, appellate courts frequently turn away interlocutory appeals involving the weightiest constitutional questions unless the appellant has met the remaining *Cohen* criteria. *See, e.g., Starcher*, 144 F.3d at 423 ("The Supreme Court has declined to extend the [*Cohen*] collateral-order doctrine to cover appeals from judgments of even the most sweeping import."). Thus, if appellants' due-process rights were violated, there is no reason to assume they cannot be fully vindicated on final appeal.

### III

### *CONCLUSION*

We are neither persuaded that the challenged sanction differs so substantially from the *Licht* sanction as to warrant distinctive treatment under either section 1291 or *Cohen*, nor that it is beyond the pale in any other respect, *cf. Eastern Maico*, 658 F.2d at 951 (noting that extraordinary remedies, like petitions for mandamus, are available to address egregious abuses of discretion under the district court's inherent powers).[9] Finally, it is noteworthy that some courts of appeals which have been more inclined to entertain these interlocutory appeals have expressed second thoughts of late. *See, e.g., Lapidus v. Vann*, 112 F.3d 91, 96 (2d Cir.) ("Were we writing on a clean slate, we would be tempted to confine *Cheng* to its unusual facts and characterize the sanctions order here as nonappealable under the *Cohen* doctrine."), *cert. denied*, —— U.S. ——, 118 S.Ct. 337, 139 L.Ed.2d 262 (1997); *Cleve-*

*land Hair*, 104 F.3d at 125 (noting that its prior interlocutory-appeal rulings had "not played to universal acclaim," and that any extension of those precedents would result in "a substantial, and unjustified, erosion of the final-decision requirement"). For our own part, particularly in the context of a criminal trial we remain loath to embrace a jurisdictional rule with the ominous implications discussed above. *See, e.g., D & H Marketers*, 744 F.2d at 1446 ("[T]he potential exists for repeated sanctions over an extended period of time, each one of which would result in an immediate appeal to this court," and hence "the potential for wasting the appeal court's time.").

*Appeal dismissed; no costs.*

---

9. Since appellants' argument that the sanction order constituted an appealable injunction is without merit, it requires no separate treatment.