06-5698-cv
Spool v. World Child International Adoption Agency

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2007

(Argued: October 19, 2007                    Decided: March 18, 2008)

Docket No. 06-5698-cv

_____

ROGER SPOOL, CHILD & FAMILY ADOPTION,
BRUCE FERGUSON, CHARLENE FERGUSON,
*Plaintiffs-Appellants*,

-v.-

WORLD CHILD INTERNATIONAL ADOPTION AGENCY,
JENKINS & POVTAK, SUSAN DIBBLE, DOREEN WHITAKER,[*]
SHARRELL J. GOOLSBY, CARL A. JENKINS,
YAROSLAV PANASOV, FOUNDATION OF WORLD CHILD, INC.,
*Defendants-Appellees*.

_____

Before:     SACK, HALL, and LIVINGSTON, *Circuit Judges*.

Domestic adoption agency, its founder, and two clients brought action against former joint venture partner and related parties for civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Computer Fraud and Abuse Act (CFAA). The United States District Court for the Southern District of New York, Charles L. Brieant, J., dismissed the amended complaint. Plaintiffs appeal.

Affirmed.

---

[*] We direct the Clerk of the Court to amend the official caption to reflect this spelling of Ms. Whitaker's last name.

MITCHELL I. WEINGARDEN, Marsh Menken & Weingarden PLLC, White Plains, NY, *for Plaintiffs-Appellants*.

DAVID HENRY SCULNICK, Gordon & Silber P.C., New York, NY, *for Defendants-Appellees World Child International Adoption Agency, Jenkins & Povtak, Susan Dibble, Doreen Whitaker, Sharrell J. Goolsby, Carl A. Jenkins*, and *Foundation of World Child, Inc.*

LIVINGSTON, *Circuit Judge*:

Plaintiffs-Appellants appeal from a judgment of the United States District Court for the Southern District of New York (Charles L. Brieant, *J.*) dismissing their claims for substantive violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, RICO conspiracy, and violation of the Computer Fraud and Abuse Act (CFAA), *id.* § 1030, for failure to state a claim on which relief can be granted, and declining to exercise supplemental jurisdiction over their related state law claims. Because we agree with the district court that the facts alleged do not establish the continuity required to prove a pattern of racketeering activity, and because the plaintiffs do not challenge the district court's dismissal of their CFAA claims, we affirm.

## BACKGROUND

We are reviewing a motion to dismiss and therefore accept the facts alleged in the amended complaint as true. *GICC Capital Corp. v. Tech. Fin. Corp.*, 67 F.3d 463, 465 (2d Cir. 1995).

## I. The Joint Venture

Child and Family Adoption ("CFA") is an authorized adoption agency in New York that was founded and managed by Roger Spool. In August 1994, CFA entered into a joint venture with the World Child International Adoption Agency ("World Child"), an international adoption agency based in Maryland and managed by Sharrell Goolsby. As part of this joint venture, World Child located children in foreign countries and processed international dossiers. CFA marketed adoptions in the New York area, helped New York-area clients to complete their international dossiers, and performed various social work services for adoptive parents in New York.

CFA, Spool, World Child, and Goolsby worked together closely for many years to build and expand international adoption services throughout New York. Pursuant to their relationship, when clients of the joint venture wanted to adopt a foreign-born child, they paid two fees directly to World Child: an agency fee and a foreign program fee. CFA was paid a fixed amount of the agency fee — an amount that remained essentially unchanged throughout its relationship with World Child — but received no part of the foreign program fee. CFA and World Child operated harmoniously under this arrangement for ten years, handling over a thousand international adoptions, including the adoption of a Russian child by plaintiffs Bruce and Charlene Ferguson. World Child grew into the fourth or fifth largest international adoption agency in the United States.

Relations between CFA and World Child began to sour in 2002 or 2003

when World Child, although receiving more services from CFA for no additional money, began to demand a greater portion of the fees that the joint venture generated, to refuse to pay invoices, and to contest the legitimacy of CFA's charges. In the fall of 2003, World Child's payments to CFA grew increasingly delinquent. Spool and Goolsby attempted to settle the dispute over several months, with Spool requesting payment of outstanding invoices and Goolsby proposing a change to the joint venture's payment structure that would reduce CFA's per-case payments by almost 40%. During this period, Goolsby also proposed that World Child hire Susan Dibble, a longtime CFA employee.

On April 2, 2004, at the conclusion of these unsuccessful efforts at conciliation, Carl Jenkins, a partner in the Jenkins & Povtak law firm that represented World Child, sent Spool a letter accusing CFA of terminating the joint venture and revoking CFA's authority to act on World Child's behalf. The day after he received Jenkins's letter, Spool left for a one-week vacation, leaving the management of CFA in the hands of Dibble and Dorene Whitaker, another longtime CFA employee. As it turned out, Spool chose an inopportune time to leave.

On April 7, 2004, in the middle of Spool's vacation, Jenkins faxed a letter to CFA confirming a threatened "shut-off" of World Child's New York operations and offering to transfer business matters, including the costs of telephones, mail handling, and other incidentals, from CFA to World Child. According to the amended complaint, another fax had been sent shortly before from CFA's office

4

to its telecommunications provider instructing the latter to forward calls placed to CFA's toll-free number to a different phone number. Spool's and Goolsby's names were affixed to this fax, but Spool did not authorize the instruction. The next day, Jenkins wrote the telecommunications provider on World Child letterhead that World Child was no longer sharing office space with CFA and requesting that all billing for the toll-free number be redirected. Dibble wrote to Spool, resigning from CFA.

The amended complaint alleges that on April 8, 2004, Dibble and Whitaker took various client files, agency licenses, office supplies, and marketing materials, including agency letterhead, from CFA's office. They used these materials to open their own branch office of World Child from Dibble's residence. World Child sent letters to its New York clients announcing that World Child's New York office was relocating and that the enterprise operated by Dibble and Whitaker would continue to provide client representation. Over the next several weeks, this enterprise engaged in various forgeries with respect to client documents, signing Spool's name without authorization, improperly notarizing signatures, and falsely affixing CFA's agency license on client documents that were submitted to the INS and foreign governments in connection with pending adoptions. Dibble and Whitaker were eventually arrested for theft and forgery; Dibble pled guilty in 2005 to forgery charges involving several CFA clients. The amended complaint alleges that even after their arrests, Dibble and Whitaker continued to operate the New York branch office of World Child in substantially

the same manner until at least April 19, 2005, on which date Dibble and Goolsby issued some sort of "joint communiqué" to World Child's employees and affiliates.

## II. The Fergusons' Adoption

The Fergusons were among the clients swept up in the fracas between CFA and World Child. Having successfully adopted a child through the joint venture in its happier days, the Fergusons began the process of applying to adopt a second child in January 2003. Along with World Child's other clients in the New York area, they received a letter in April 2004 informing them that World Child's New York office had relocated, but failing to indicate that this new office was no longer affiliated with CFA. In May 2004, the Fergusons paid World Child $12,200 in foreign program fees in connection with their application to adopt a Russian child.

As the Fergusons prepared to travel to Russia to finalize their adoption, they received instructions from the office now operated by Dibble and Whitaker to bring large amounts of cash to use as gifts for Russian officials. When they arrived in Russia in early August 2004, the Fergusons were met by defendant Yaroslav Panasov, World Child's Moscow-based representative who assisted the Fergusons before the local court. The Fergusons were required to entertain and feed Panasov, and several of the gifts they were instructed to provide went to him and to World Child's Moscow office, even though the Fergusons had already

6

paid over $12,000 in foreign program fees. On August 10, 2004, the Russian court denied the Fergusons' adoption application because it found irregularities in their documentation. Panasov filed a handwritten appeal, which was denied on August 27, 2004. The Fergusons later learned that several of their documents, including the required update of a home study originally done by CFA in 2003, had been falsified and forged by Dibble.

The amended complaint contains additional allegations about World Child's billing of foreign program fees allegedly based upon information to which Spool was privy in his capacity as the head of CFA. In 2002, according to the amended complaint, Spool was told by Goolsby and Jenkins that World Child was increasing the foreign program fee that it charged to clients and that it was using the extra payments to cover general expenses while informing clients that the entire fee was necessary to pay foreign affiliates to process adoptions. The plaintiffs allege that World Child deposited at least some of these extra fees into the Foundation of World Child, Inc. (the "Foundation"), a purportedly not-for-profit entity affiliated with World Child that was managed by Jenkins and allegedly used to shelter World Child's assets in order to avoid legal judgments. The amended complaint does not allege that this activity caused damage to Spool or CFA, nor that CFA objected to it.

## III. District Court Proceedings

The plaintiffs commenced an action in the district court, alleging substan-

tive violations of RICO, RICO conspiracy, violations of the CFAA, and various state law torts. Specifically, the plaintiffs allege the following RICO violations. First, they allege that each defendant violated 18 U.S.C. § 1962(b) by maintaining control of alleged RICO enterprises consisting of the Foundation and Dibble and Whitaker's New York branch office of World Child through a pattern of racketeering activity — namely, the theft of CFA-related property and the defrauding of the Fergusons and other joint-venture clients. Section 1962(c) was allegedly violated when the defendants, being associated with the New York branch office, engaged in this pattern of racketeering activity. Second, they allege that the defendants violated § 1962(d) by conspiring to participate in the illegitimate operation of the New York office, including the fraudulent acts against the Fergusons and the theft of CFA's property, and the alleged funneling of money from the New York office to the Foundation to shield assets from potential creditors. Finally, the plaintiffs allege that the defendants violated § 1962(a) by defrauding joint-venture clients and using the income derived from their frauds to operate the Foundation.

The district court dismissed Panasov as a defendant on grounds of insufficient process and service of process, dismissed the federal claims against the remaining defendants, and declined to exercise supplemental jurisdiction over the state claims. With respect to the RICO claims in particular, the district court concluded that "the RICO allegations are present only as a jurisdictional hook to access the federal courts with what may be valid state law claims for

8

fraud and breach of contract." The court held that the amended complaint did not allege a pattern of racketeering activity. The plaintiffs appeal this determination.

**DISCUSSION**

We review the district court's decision de novo, reading all well-pleaded allegations in the plaintiffs' favor. *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001). Although we construe the pleadings liberally, "bald assertions and conclusions of law will not suffice." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The pleadings must create the possibility of a right to relief that is more than speculative. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

"To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'" *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (quoting *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 101 F.3d 900, 904 (2d Cir. 1996)). This case implicates the first of these three requirements, namely, whether the plaintiffs have adequately alleged a violation of the RICO statute.

To establish a substantive RICO violation, a plaintiff must show a "pattern of racketeering activity," 18 U.S.C. § 1962(a)-(c), and to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO

9

violation, *id.* § 1962(d).  Thus, "[u]nder any prong of § 1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.'"  *GICC Capital Corp.*, 67 F.3d at 465.  To survive a motion to dismiss, this pattern must be adequately alleged in the complaint.

According to RICO's definitional section, a "'pattern of racketeering activity' requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1), and they must be "related, and [either] amount to or pose a threat of continuing criminal activity."  *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (emphasis omitted) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)) (internal quotation marks omitted).  The latter so-called "continuity" requirement can be satisfied either by showing a "closed-ended" pattern — a series of related predicate acts extending over a substantial period of time — or by demonstrating an "open-ended" pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed.  *H.J. Inc.*, 492 U.S. at 241; *DeFalco*, 244 F.3d at 320; *Cofacrèdit*, 187 F.3d at 242; *GICC Capital Corp.*, 67 F.3d at 466.  We agree with the district court that the plaintiffs here have alleged neither a closed-ended nor an open-ended pattern of racketeering activity.

## I. Closed-Ended Continuity

"To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'" *Cofacrèdit*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492 U.S. at 242). Although factors such as the number and variety of predicate acts and the number of participants may be germane to this showing, "closed-ended continuity is primarily a temporal concept." *Id*. The relevant period, moreover, is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place. *DeFalco*, 244 F.3d at 321; *Cofacrèdit*, 187 F.3d at 243; *cf. GICC Capital Corp.*, 67 F.3d at 467 ("Because GICC does not allege any racketeering activity in connection with the individual CRI defendants' takeover of CRI, the takeover cannot form the starting point of defendants' pattern of racketeering activity.").

Since the Supreme Court decided *H.J. Inc.*, we have "never held a period of less than two years to constitute a 'substantial period of time.'" *Cofacrèdit*, 187 F.3d at 242. This conception of the substantiality requirement accords with that of other circuits. *See GICC Capital Corp.*, 67 F.3d at 468. Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where, as here and as in *GICC Capital Corp.*, "[t]he activities alleged involved only a handful of participants" and do not involve a

11

"'complex, multi-faceted conspiracy.'" *Id.* (quoting *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 948 (S.D.N.Y. 1989)).

Even under the most liberal reading of the amended complaint, the plaintiffs' allegations fall short of this benchmark. The amended complaint alleges that some unspecified RICO predicates began occurring in January 2004 and continued "at least" through April 19, 2005, when Dibble and Goolsby issued their "joint communiqué": "Upon information and belief, the Defendants engaged in the above activities and conduct between January 2004 and at least April 19, 2005." (First Am. Compl. ¶ 126.) This sixteen-month period of time is insufficient to establish closed-ended continuity — particularly in the absence of separate schemes or large numbers of participants and victims. *See DeFalco*, 244 F.3d at 322.

Neither does this conclusion change if we construe the amended complaint to allege that the defendants began conspiring in late 2003 to steal CFA's confidential files. The law is clear that "the duration of a pattern of racketeering activity is measured by the RICO predicate acts" that the defendants are alleged to have committed. *Cofacrèdit*, 187 F.3d at 243; *accord DeFalco*, 244 F.3d at 321. Ordinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1). Such a conspiracy, even if it had been properly pled, therefore cannot establish a period of racketeering activity beginning in 2003. Even if the plaintiffs *had* adequately alleged a RICO predicate that commenced in late 2003, moreover, the period would still be

insufficient.

Nor can the defendants' alleged overcharging of foreign program fees in late 2002 begin the reference period. The amended complaint does not allege these excessive charges to constitute any particular RICO predicate. Even if we assume that these activities could constitute mail fraud or wire fraud if proved, moreover, the amended complaint is still legally insufficient because the allegations regarding the foreign program fees have not been pled with the requisite particularity. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("[A]ll allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."). Allegations of predicate mail and wire fraud acts "should state the contents of the communications, who was involved, [and] where and when they took place, and [should] explain why they were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). Here, the only specifically identified individuals who are alleged to have paid foreign program fees are the Fergusons, who did so in 2004. The amended complaint, moreover, does not allege any specific fraudulent communications about foreign program fees to them or to anyone else. The *sole* allegation with regard to fraudulent representations in connection with these fees consists of the allegation that Spool was told by Jenkins and Goolsby in 2002 that they were increasing the foreign program fee and using the increase to cover general expenses while informing clients that the extra fee was necessary to pay foreign affiliates. This spare

pleading is insufficient to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. *See Lerner v. Fleet Bank*, 459 F.3d 273, 290 (2d Cir. 2006); *Mills*, 12 F.3d at 1175.

Accordingly, we agree with the district court and find that the alleged predicate acts span a period of no more than sixteen months, a "period . . . of insufficient length to demonstrate closed-ended continuity under this Court's precedents." *DeFalco*, 244 F.3d at 322.

## II.  Open-Ended Continuity

"To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit*, 187 F.3d at 243.  This threat is generally presumed when the enterprise's business is primarily or inherently unlawful. *Id.* at 242-43; *GICC Capital Corp.*, 67 F.3d at 466; *see also United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) ("[W]here the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established . . . ."); *United States v. Indelicato*, 865 F.2d 1370, 1383-84 (2d Cir. 1989) (en banc) ("Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of

14

continued racketeering activity.").

When "the enterprise primarily conducts a legitimate business," however, no presumption of a continued threat arises. *Cofacrèdit*, 187 F.3d at 243. In such cases, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id*. In this case, we have no difficulty concluding that the enterprise alleged here falls into the category that is primarily legitimate given that the joint venture between World Child and CFA managed over one thousand successful adoptions during the ten-year period predating this dispute.

The plaintiffs cannot avoid this determination by framing the RICO enterprise as consisting solely of the Foundation and the New York branch office operated by Dibble and Whitaker, or by otherwise separating the alleged RICO enterprise from World Child's previously legitimate business. "[T]he RICO statute defines an 'enterprise' as 'includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *DeFalco*, 244 F.3d at 306-07 (second alteration in original) (quoting 18 U.S.C. § 1961(4)). The enterprise can be any "'ongoing organization, formal or informal,'" that "'function[s] as a continuing unit.'" *United States v. Morales*, 185 F.3d 74, 80 (2d Cir. 1999) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The amended complaint makes clear that World Child was not a disconnected entity

15

but part of whatever enterprise existed. Indeed, in a letter to Goolsby that is quoted in the amended complaint and dated July 28, 2004, during the height of the dispute, Spool acknowledged as much, referring to Dibble and Whitaker as "personnel in the World Child New York office." Furthermore, the Foundation was allegedly funded by World Child using money collected through World Child's allegedly fraudulent billing practices. Thus, the amended complaint itself makes apparent that World Child was not merely a part, but a central and necessary part, of an "organization" that "function[ed]" as a "unit" "for a common purpose of engaging in a course of conduct." *See Turkette*, 452 U.S. at 583.

Viewed in this manner, the enterprise cannot be said to pose a threat of continuing conduct. At most, the amended complaint states that World Child's branch office fraudulently continued to process client cases over a period of several months following the fallout between Spool and Goolsby and the defection of Dibble and Whitaker. A scheme of this sort is "inherently terminable" because once the defendants conclude the fraudulent "processing," they have no more CFA-related files with which to work. *See Cofacrèdit*, 187 F.3d at 244 ("[A]n 'inherently terminable' scheme does not imply a threat of continued racketeering activity."); *GICC Capital Corp.*, 67 F.3d at 466 ("It defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot."). This case is thus distinguishable from cases such as *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.) (en banc), *vacated and remanded mem.*, 492 U.S. 914, *adhered to on remand*, 893 F.2d 1433 (2d Cir.

16

1989), in which we held that a "one-time" barrage of fraudulent mailings was "sufficient to plead a pattern of racketeering activity" because "there was a basis to infer that similar mailings would occur in the future." *GICC Capital Corp.*, 67 F.3d at 466 (citing *Beauford*, 865 F.2d at 1392). Here, in contrast, the amended complaint alleges only "a serious, but discrete and relatively short-lived scheme to defraud a handful of victims," which is insufficient to establish open-ended continuity. *Cofacrèdit*, 187 F.3d at 244.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.