New England Merchants National Bank *v.* Latshaw.

NEW ENGLAND MERCHANTS NATIONAL BANK *vs.*
JOHN H. LATSHAW
(and a companion case[1]).

Middlesex.    May 8, 1981. — June 24, 1981.

Present: GREANEY, CUTTER, & KASS, JJ.

*Surety. Contract,* Indemnity. *Uniform Commercial Code,* Transfer of
collateral, Accommodation party.

An action against indemnitors by the owner of collateral which had been
pledged to secure certain loans was premature, and an attachment of
realty obtained in that action was, therefore, properly dissolved where
the action was commenced immediately after the plaintiff was notified
by the creditor bank that it was accelerating the notes and transferring
the pledged shares to itself and before the bank had applied the
securities to discharge the debt so that the plaintiff had not yet sus-
tained a loss when the action was brought. [152-153]

CONTRACT. Writ in the Superior Court dated February
2, 1971.
BILL IN EQUITY filed in the Superior Court on February
26, 1974.
The cases were heard by *Morse,* J.
*David Rapaport* for John H. Latshaw.
*Roger B. Sherman* for New England Merchants National
Bank.

KASS, J.  The sequence of events poses the problem:  Did
the defendant John H. Latshaw launch an action against in-
demnitors prematurely so that an accompanying attach-
ment was similarly premature?  Solving that question re-
quires answering another:  Had Latshaw sustained a loss
under a stock pledge agreement when he began his law suit?
    Latshaw had pledged 27,789 shares of United Servoma-
tion Corp. as collateral on January 13, 1970, to secure loans

---

[1] John H. Latshaw *vs.* George D. O'Day & another.

made to Gemico Corporation by the Framingham National Bank (FNB). Those shares of stock were then worth about $900,000. Later in the year Gemico's loans increased in amount and George D. O'Day, who was a founder and director of Gemico, as well as its president and principal stockholder, and O'Day's wife, Miriam, entered into an indemnity agreement with Latshaw under which they agreed to indemnify Latshaw for "any loss or expense" which he might incur by reason of his hypothecation of securities in aid of Gemico.

Gemico failed to make a regular loan payment to FNB which was due January 15, 1971. On February 2, 1971, an officer of FNB notified Latshaw's lawyer by telephone of Gemico's default, that FNB was accelerating Gemico's note and was transferring Latshaw's pledged shares to itself. Latshaw's lawyer had learned that New England Merchants National Bank (the Merchants), another creditor of Gemico, was also restive about that company's ability to pay its debts and that the O'Days were going to give a second mortgage of their real estate to the Merchants. Allowing no grass to grow under his feet, Latshaw's lawyer filed an action that day against the O'Days based on the indemnity agreement and secured an attachment against Mrs. O'Day's realty. It is that action and attachment which Merchants says jumped the gun.

On the following day, February 3, 1971, FNB dispatched a letter to Latshaw informing him that the Gemico note was in default, demanding $1,049.48 on account of interest due on January 15, 1971, and advising him that the "Bank is exercising its option to transfer to itself or its nominee" the securities which had been pledged. Some two weeks later, on February 19, 1971, FNB for the first time trained its artillery on the debtor, Gemico, to which it sent a registered mail notice, with copy to Latshaw, that Gemico's note had come due February 16, 1971. That letter demanded payment in full, failing which "we *shall* be forced to look to the collateral we hold for satisfaction of this debt" (emphasis supplied).

In the action brought by Merchants to dissolve Latshaw's attachment,[2] a Superior Court judge held that Latshaw had not sustained a loss under the indemnification agreement when his action against the O'Days began on February 2, 1971, that the action was, therefore, premature, and that the attachment which Latshaw had obtained ought to be dissolved. In the companion case, which was the underlying action by Latshaw against the O'Days, the judge ruled that the action was premature, but that since Latshaw had, after commencement of the action, paid $87,065.11 to FNB to discharge Gemico's obligation, Latshaw was entitled to exoneration for that amount — but not as of February 2, 1971. We affirm the judgments. No appeal was taken by the O'Days in the companion case and, therefore, the force of the judgment as to them is not in issue.

By the pledge of his stock, Latshaw stood surety for Gemico. As a surety he was entitled, even without an express agreement, to indemnity when he was injured by payment in discharge of Gemico's liability. *Ricker* v. *Ricker*, 248 Mass. 549, 551 (1924). *Wolverine Ins. Co.* v. *Tower Iron Works, Inc.*, 370 F.2d 700, 703-704 (1st Cir. 1966). Williston, Contracts § 1274, at 866-868 (3d ed. 1967). See *Eliot Sav. Bank* v. *Aetna Cas. & Sur. Co.*, 310 Mass. 355, 357-358 (1941). (The significance of the written indemnity agreement in this case is that it added the O'Days, who were not principals on the loan, as indemnitors.) In their emphasis on payment of the underlying instrument, the authorities cited are consistent with the principles of § 3-415 of the Uniform Commercial Code, which provides that an accommodation party, "if he pays the instrument has a right of recourse on the instrument against" the party accommodated. G. L. c. 106, § 3-415(5).

No payment had occurred on February 2, as is evident from the bank's subsequent letter of February 19, in which it said that it would, in the future, look to the collateral

---

[2] See G. L. c. 223, § 106, under which a person may dispute the validity of a prior attachment.

posted by Latshaw if the Gemico note were not promptly paid. In the context of what occurred, FNB's oral communication of February 2 was no more than the saber-rattling which customarily precedes action when a note becomes delinquent. This appraisal of what happened on February 2 is not just a matter of our second sight, which Latshaw on that day could not have foreseen. Even if the bank's statement on that date and on February 3 that it "was transferring to itself" the Servomation stock could be read as describing an event that had occurred, rather than one that was to occur, under neither the loan documents nor applicable provisions of the Uniform Commercial Code was this an application of the securities to the debt. Section 3 of the pledge agreement permitted transfer of the securities to the bank whether or not the underlying loan was in default. Upon nonperformance of the borrower's obligation, however, the bank became empowered to sell so much of the securities as was necessary to discharge the debt. Had FNB proposed to retain the securities in satisfaction of the debt, it would have been required to send written notice to the debtor — and the person who furnished the collateral[3] — and if objection were made within thirty days, the bank, as the secured party, would be required to dispose of the collateral. G. L. c. 106, § 9-505, as in effect prior to St. 1979, c. 512, § 7 (dealing with retention of collateral) & § 9-504, as in effect prior to St. 1979, c. 512, § 7 (dealing with disposition of collateral).

Because the securities were not applied to discharge of Gemico's debt on February 2, no payment of Gemico's debt occurred and Latshaw sustained no loss.[4] Actions on the indemnity agreement, therefore, were premature.

*Judgments affirmed.*

[3] Under G. L. c. 106, § 9-105(d), as in effect prior to St. 1979, c. 512, § 7, the term "debtor" means the owner of the collateral in any provision of art. 9 dealing with the collateral.

[4] FNB never sold the pledged stock. Ultimately, Latshaw paid the balance due on Gemico's note and FNB assigned to Latshaw the note and George O'Day's guaranty of that note.